CHRISTINE G. MAAS, Plaintiff-Appellant, *v.* BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 529 *et al.*, Defendants-Appellees.

Fifth District    No. 78-274

Opinion filed March 20, 1981.

HARRISON, J., dissenting in part.

Stephen M. O'Byrne, of Reno, O'Byrne & Kepley, of Champaign, for appellant.

Laurence L. Arnold, of Olney, for appellees.

Mr. JUSTICE JONES delivered the opinion of the court:

Plaintiff appeals from a summary judgment rendered for defendant board by the circuit court of Richland County in her action for *certiorari* for review of an administrative hearing conducted by the board, and for *mandamus*.

In and prior to the fall of 1974 the plaintiff was a tenured faculty member of Community College District No. 529. She was an instructor in physical education and was teaching on the campus of Olney Central College, one of three constituent colleges which comprise Community College District No. 529. In the fall of 1974 the plaintiff made an application for sabbatical leave for the 1975-76 academic year. In response to plaintiff's request, George Williams, dean of instruction and a member of the sabbatical leave committee, sent plaintiff a letter dated March 6, 1975, voicing reservations about Western Colorado University, which plaintiff proposed to attend, and requesting a written proposal for study, the objective she would be pursuing and how that objective would benefit Olney Central College. The letter also asked plaintiff to submit a copy of a catalogue or brochure that would describe Western Colorado University. In compliance with this request plaintiff submitted a proposal which envisioned 36 semester hours of study which, when taken with her post-graduate work at Eastern Illinois University, would entitle her to a doctor's degree from Western Colorado University. The required 36 semester hours would be comprised of 8 hours of in-residence work at the Grand Junction campus of Western Colorado University and 28 hours to be earned in Illinois by using the facilities of the University of Illinois and/or Eastern Illinois University.

It is plaintiff's own description of Western Colorado University that it is a "non-traditional school in that it refers to itself as a university without walls," and that "many of its students are non-resident and pursue their degrees while using the facilities of other institutions pursuant to inter-college cooperating agreements."

By letter dated May 6, 1975, the sabbatical leave committee notified plaintiff that a sabbatical leave had been granted her for one quarter with full pay (one-third of her base salary of $16,450 based upon FY-76 salary, equal to $5,483) and stated that the committee would recommend "that the administration grant Mrs. Maas a leave of absence for the two remaining quarters of the academic year of 1975-76." The letter also recited: "If you are prepared to accept the action of the Sabbatical Leave

Committee, please advise me. The administration would also need your request submitted in writing for a leave of absence for the two remaining quarters of the academic year 1975-76."

The record indicates that there were one or more conversations between college officials and the plaintiff that took place in May 1975 in which plaintiff was told that she could have a sabbatical leave of one quarter with pay and a two-quarter professional leave without pay. Paul Thompson testified that part of such conversations occurred while he was president of Olney Central College and that he informed plaintiff in June 1975 that the proposal of the sabbatical leave committee was not severable. Plaintiff testified that she did not recall this conversation.

By letter dated May 12, 1975, plaintiff advised the dean of instruction and the sabbatical leave committee that it was her request that if another faculty member was granted leave and did not use it, then the unused portion be granted to her. Her letter stated that with that stipulation she would be most happy to accept the action of the committee and would submit a written request for leave of absence for the two remaining quarters of the 1975-76 academic year in the event no additional sabbatical leave became available.

Dean Williams responded with a letter dated May 20, 1975, which advised plaintiff that any sabbatical leave money unused by another faculty member would not be made available for her use. He asked her early response to the sabbatical as it had been offered to her.

Plaintiff sent Dean Williams the following letter dated June 11, 1975:

"This letter is to advise you that I will accept the sabbatical leave granted me for one quarter with full pay.

I will, therefore, take the sabbatical leave fall quarter of the 1975-76 school year."

It is to be noted that this letter made no reference to a request for professional leave for the two remaining quarters of the 1975-76 school year.

In the latter part of May 1975 plaintiff found a teaching contract for school year 1975-76 in her mailbox at the college. The contract was dated May 20, 1975, and had been placed in her mailbox as a part of the ongoing administrative routine of the college. Plaintiff executed the contract by signing it and placing it in the mailbox of John Stencil, her division chairman.

On June 18, 1975, the chancellor of the college, James Spencer, sent plaintiff a letter notifying her that her sabbatical leave had been approved by the board of trustees. This letter stated, in part, that "[t]he specifics of your leave are stated on page three in the Report of the Chancellor of the June meeting, should you have any questions regarding these recommendations."

A second teaching contract for the 1975-76 academic year which

reflected the grant of sabbatical leave, dated June 17, 1975, was prepared and placed in plaintiff's faculty mailbox. This contract recited that plaintiff's base salary would be "$5,483.33 (1/3 of salary for Sabbatical Leave)."

On July 5, 1975, plaintiff left Illinois to fulfill her on-campus residence requirement at Western Colorado University and did not return until mid-August. Plaintiff testified that she had learned of the board of trustees' action which granted her one quarter of sabbatical leave and two quarters of professional leave of absence for 1975-76 from a local newspaper's report of the board's action at its June meeting. She had expressed surprise at the grant of professional leave because she had never requested it. She also stated that she had not been aware that the board was considering a grant of professional leave. This testimony was apparently contradicted by the board's exhibits Nos. 11 and 12. Exhibit No. 11 was a copy of the memorandum of the sabbatical leave committee to Chancellor Spencer, dated May 28, 1975, detailing the leave recommended for plaintiff as one quarter at full pay and recommending the granting of her request for two quarters of professional leave. Exhibit No. 12 was a copy of page 3 of the report of the chancellor to the board as an agenda item for its June 17 meeting. Page 3 detailed the sabbatical leave recommendation for plaintiff of one quarter with pay; it also stated that plaintiff requested professional leave for two quarters and recommended that the board grant the request. Exhibits 11 and 12 had been mailed to plaintiff prior to the meeting of the board. Plaintiff explained her failure to receive these items, and the second teacher's contract, by her testimony that she was on sick leave and did not teach in the spring of 1975 and was seldom on campus. On the few occasions she was on campus the lounge (the location of the faculty mailboxes) had been locked. She stated that she had not received these materials until September of 1975 when the accumulated mail had been sent to her at her home address in Olney.

Continuing her testimony, plaintiff stated that upon learning of the action of the board at its June meeting she had approached a Mr. Lathrop regarding the grant of unrequested leave and, according to plaintiff, he told her a request for professional leave need be made only at least one quarter prior to the leave time requested. Acting on this information plaintiff had decided to do nothing regarding the matter until she returned in the fall.

After plaintiff returned from Colorado she contacted President Thompson to pursue the matter of the professional leave of absence. She met with him on September 5, 1975, and told him she did not want the professional leave of absence; she wanted to resume her teaching. Thompson told plaintiff that it was his interpretation that acceptance of the sabbatical leave constituted an acceptance of the two quarters of

professional leave as well. He also told plaintiff that she was not on the payroll for 1975-76 at all since the district had not received either the teacher's contract of May 20, 1975, or the sabbatical leave contract of June 17. He advised plaintiff that if she did not agree with his interpretation she could appeal his decision to Chancellor Spencer. President Thompson confirmed the content of this meeting with plaintiff by a letter to plaintiff dated September 5, 1975, with a copy to Chancellor Spencer.

Following the meeting with Thompson, plaintiff sought an appeal to Chancellor Spencer. A meeting was accordingly arranged for the following day, September 6, 1975, at the residence of Chancellor Spencer, with plaintiff, Chancellor Spencer and President Thompson present. The meeting was essentially a reprise of plaintiff's meeting the previous day with President Thompson. Plaintiff's contract status and sabbatical leave were discussed. Plaintiff persisted in her request of a sabbatical leave for a full year at half pay. Spencer and Thompson countered with the opinion that the matter of the sabbatical leave had been settled by the actions taken in May and June and that plaintiff had received notice of such action through more than one medium before leaving for Western Colorado University. Plaintiff denied the receipt of notice of the sabbatical grant as voted by the board in June. The September 6 meeting concluded without agreement. Chancellor Spencer testified that plaintiff had asked for a one year sabbatical leave at one-half pay, her original request. Upon being told this was probably not possible, plaintiff had then requested as an alternative plan sabbatical leave for the fall quarter with professional leave for two quarters for the purpose of pursuing her doctorate at either the University of Illinois or Eastern Illinois University, and not at Western Colorado University. He further testified that he had stated that he would take this request under advisement and present it to the board of trustees at their September meeting.

Plaintiff's version of the conclusion of the September 6 meeting varied somewhat from that of Chancellor Spencer. By her version she had stated that she intended to continue with her original plan to pursue a doctor's degree from Western Colorado University by using the facilities of the University of Illinois and Eastern Illinois University. She did not request or accede to a change of plan whereby she would drop her enrollment in Western Colorado University and change to the University of Illinois or Eastern Illinois University. She had told Chancellor Spencer she did not know whether or not she would sign a copy of the contract that had been sent to her in June if another one were sent to her.

The plaintiff has never, to this time, acceded to the original grant of sabbatical leave for one quarter and two quarters of professional leave.

Following the meeting of September 6, 1975, a series of letters were exchanged by plaintiff, President Thompson and Chancellor Spencer.

Since the letters have a bearing on an issue regarding agreement-integration raised by plaintiff, we will note them briefly. On September 8, Spencer wrote plaintiff advising her that the board of trustees approved the recommendation of the sabbatical leave committee concerning sabbatical leave for 1975-76. A duplicate copy of the June 17, 1975, contract was enclosed. On September 9 plaintiff wrote Chancellor Spencer a letter in which, essentially, she reviewed her understanding of the entire matter and restated her position. On September 10, plaintiff wrote Chancellor Spencer an acknowledgment of receipt of his letter of September 8 and asked for a copy of the resolution of the board of trustees which had granted her the sabbatical leave and leave of absence "so that I may review the specifics of my leave." On September 11 Chancellor Spencer wrote plaintiff in reply to her letter of September 10 enclosing a copy of the May 28, 1975, recommendation of the sabbatical leave committee and a copy of the report of the chancellor which served as the basis of the board's grant of sabbatical and professional leave. The September 11 letter further stated:

> "It is absolutely incredible to me that at this late date, you would be alleging that you have not received letters and contracts from me or others with administrative responsibility and that you should imply that you were unaware, not only of what the Board of Trustees did at its June meeting, but even more incredible is the view that you did not know what the Board *was going to do at the June meeting*. As a minimum, you knew about the contemplated action from the following sources:
>
> 1. By having received a copy of the enclosed May 28th memo from Mr. Williams to me.
>
> 2. You knew about it from having received a copy of our Board mailing one week prior to the meeting of the Board of Trustees. All employees are provided with this mailing.
>
> Finally, you were certainly made aware of the Board's action by my letter to you dated June 18, 1975, a copy of which has been sent to you as well as a duplicate contract reflecting the Board's action which was also sent to you.
>
> I do not know what the college administration wishes to recommend to me as to your status with the college, but my position at this time is that we have no contractual obligation to you whatever.
>
> Since, however, the Board established a salary for you for the 1975-76 academic year at its meeting in May, after which you requested a sabbatical leave and a professional leave in order to be free to complete your Ph.D. during this year, I would assume that that contributed to your failure to accept, sign and return the contract offered you by the Board in May.

At this time, I can think of no reason you would not have signed and returned the contract extended to you by the Board of Trustees in June as recommended by a committee of your peers at OCC.

As stated earlier, as far as this office is concerned, there exists no contractual relations between you and the Board of Trustees; however, I will be pleased to be guided by the faculty and administration of the college in formulating any recommendation which might clarify what contractual relations, if any, do exist between the two parties." (Emphasis in original.)

On September 13 plaintiff replied to the Spencer letter of September 11. She restated her position, again denied receipt of any notice of the June 17 action of the board, stated her assumption that she was on a *regular* contract although she was then on sabbatical leave for the fall quarter, and, "[i]t is my greatest desire to seek an amicable settlement." On September 15, President Thompson wrote plaintiff:

"As we understand it, you are now seeking a response in either the affirmative or negative as to whether you will be granted a full year's sabbatical leave at half salary for the 1975-76 academic year. I think that response has already been communicated to you several times, most recently, by way of a contract for sabbatical leave for one quarter at full pay and two quarters of professional leave.

However, in order to allow you the fairest possible consideration, I am calling a meeting of the Sabbatical Leave Committee this week in order for them to reconsider your original request. Should their recommendation change, I will inform you of that fact and we will proceed accordingly from that point."

From the tenor of the correspondence following the September 5 and 6 meetings, it is readily evident that the college administration harboured considerable displeasure with plaintiff over the events surrounding her application for sabbatical leave for school year 1975-76.

On September 17 President Thompson wrote plaintiff as follows:

"You have received or will soon be receiving a letter and a contract indicating the action taken by the Board of Trustees of Illinois Community College District 529 at its September 16, 1975 meeting. This action supercedes the action I had proposed in my previous letter. I might say that the Board of Trustees thought my proposal was too liberal and that they felt they were being more than fair by re-issuing this contract for your acceptance.

I met today with the Sabbatical Leave Committee at Olney Central College. It was the unanimous opinion of the committee that the leave recommended for you last spring was indeed what

they would support now. Therefore, there is no change in their position, in my position, or in the position of the Board of Trustees. I would also add that the interpretation that is placed upon this leave by the above mentioned groups is that acceptance of the sabbatical leave implies that you intend to use the full academic year for study as you requested.

I do hope this will help to bring speedy resolution to a problem that should have been resolved long ago."

Also on September 17, Chancellor Spencer wrote plaintiff this letter:

"Enclosed herewith is a contract for the 1975-76 academic year approved yesterday by the Board of Trustees. It is identical to the contract extended to you on June 17, 1975 with the exception that the sabbatical and professional leaves are granted for the purpose of your pursuing either the doctorate or other advanced work on a full-time basis at Eastern Illinois University and/or the University of Illinois. This is in lieu of your plans to attend Western Colorado University which were your plans at the time you originally requested the sabbatical leave.

It is imperative that you accept or reject this contract and return it to this office within fifteen days from this date.

If you accept the contract, you will assume your position as a full-time faculty member at Olney Central College in September of 1976. If you reject the contract, it is the position of the Board of Trustees that all contractual relations between you and it are terminated. Failure on your part to either accept or reject within the fifteen day period shall also constitute termination of contractual relations.

Personal regards and very best wishes."

Accompanying this letter was a standard, brief form contract dated September 16, 1975, for the 1975-76 academic year which provided that plaintiff's salary would be "$5,483.33 (1/3 of salary for Sabbatical Leave) (Sabbatical Leave for Fall Quarter and Professional Leave for Winter and Spring Quarter)."

The action of the board of trustees at their meeting of September 16, 1975, alluded to by Thompson and Spencer in their letters of September 17, was the adoption of the following resolution:

"B. *Contract Extended*—Trustee William E. Hoffee made a motion that Christine Maas be extended a contract identical to the one extended in June, 1975 by the Board of Trustees and that it be broadened to include her pursuit of the Doctorate at Eastern Illinois University and the University of Illinois, under terms of the previous contract. Said contract must be accepted, if at all, within 15 days."

Plaintiff signed and returned the new contract on September 26, 1975. Her acceptance recited "＊ ＊ ＊ I do intend a Sabbatical Leave in the said College District for the academic year of 1975-76."

On or about September 29, 1975, officials of the college made inquiry of the University of Illinois and Eastern Illinois University and were advised by letters that plaintiff was not enrolled in either institution. Upon similar inquiry it was learned that plaintiff was enrolled and in good standing at Western Colorado University.

On October 21, 1975, Chancellor Spencer advised plaintiff, in writing, that she had been suspended for violating the terms of the sabbatical-professional leave agreement and that he intended to recommend to the Board of Trustees that she be dismissed.

By resolution adopted October 21, 1975, the board of trustees dismissed plaintiff from the faculty of the college effective January 1, 1976. The resolution provided that payment of salary to plaintiff was suspended until the date of termination because of her failure to comply with her contract. A copy of the board's resolution was sent to plaintiff by registered mail and was received by her on October 23, 1975.

The college policy manual sets forth a "Procedure for Termination of Tenured Appointments Other than Retrenchment." It provides that a faculty member shall be entitled to a hearing before the board of trustees upon request. On November 14, 1975, plaintiff's attorney requested a bill of particulars and a hearing. The bill of particulars was furnished and a hearing was set for December 19, 1975. By agreement of the parties the hearing was rescheduled for, and held on, January 29, 1976. The board of trustees enlisted the aid of an experienced practicing attorney to serve as its presiding officer at the hearing.

At the hearing the plaintiff testified that the language in Chancellor Spencer's forwarding letter of September 17 troubled her, but she signed the contract anyway. It was her understanding, she said, that she was signing and agreeing to the terms of the contract extended by the board of trustees and not Chancellor Spencer's cover letter. Plaintiff further stated that she was of the opinion that had she cancelled her enrollment at Western Colorado University after signing the September 16 contract she would have violated her original request for sabbatical leave. She expressed it as her opinion that her failure to enroll at either Eastern Illinois University or the University of Illinois after September 26, 1975, did not violate the September 16 agreement.

On cross-examination plaintiff gave testimony which indicated she was informally auditing classes at Eastern Illinois University without being enrolled so to do and without paying a fee. This mode of attendance was shown to be illegal under that university's policy.

Following the hearing the board of trustees found that plaintiff had

violated her sabbatical-professional leave agreement by failing to enroll at either Eastern Illinois University or the University of Illinois, and she was dismissed effective January 29, 1976.

Plaintiff thereupon filed a three-count complaint in circuit court seeking review of the board's action. Count I was for review pursuant to the Administrative Review Act. Count II sought review by the common law writ of *certiorari*, and, as an alternative, Count III sought a writ of *mandamus* directing the defendant Board to reinstate plaintiff.

Count I of plaintiff's complaint seeking review pursuant to the Administrative Review Act was dismissed on defendant's motion. A writ of *certiorari* was ordered to issue to respondent board of trustees, directing them to certify the record in the proceedings leading to the discharge of plaintiff. The record shows that the respondent board duly responded to the command of the writ.

Plaintiff filed a motion for summary judgment as to count II of her complaint, and defendant filed a motion as to counts II and III. The parties subsequently entered into a stipulation that in ruling upon the motions for summary judgment the court should consider the entirety of the record in lieu of affidavits and counteraffidavits, neither of which had been filed. After consideration, the trial court entered an order denying plaintiff's motion for summary judgment and granting that of the defendant. Plaintiff brought this appeal. We must affirm.

Although the matter has no bearing on the outcome of the case, we would interpose a query as to the procedure utilized by the parties and the trial court to present for determination the issues raised by count II. The trial court granted *certiorari*, and this brought before it for review the entire record made before the administrative tribunal, the board of trustees. Then, in a seemingly redundant maneuver, each of the parties filed motions for summary judgment in which they alleged the legal sufficiency (defendant) or insufficiency (plaintiff) of the record to support the board's decision. The motions for summary judgment were followed by a stipulation that in ruling upon the motions the trial court could consider the entire record made before the board. Thus, following the motions for summary judgment and the stipulation, once again the trial court had before it for review the record made before the board. The implicit invitation to comment is respectfully declined.

Defendant contends that *certiorari* was not a proper remedy for plaintiff since she had an adequate remedy at law, that being an action for damages for breach of contract. Defendant cites *Barden v. Junior College District No. 520* (1971), 132 Ill. App. 2d 1038, 271 N.E.2d 680, *cert. denied* (1972), 406 U.S. 920, 32 L. Ed. 2d 120, 92 S. Ct. 1777, which does in fact support defendant's argument. However, we deem the *Barden* case to have been improvidently decided and decline to follow it. *Barden* held

that *certiorari* was improper where another remedy is available. The other remedy they referred to was a suit for breach of contract. A suit for breach of contract is not a method of review.

It is conceded by plaintiff that the Administrative Review Act (Ill. Rev. Stat. 1977, ch. 110, par. 264 *et seq.*) is unavailable to review the action of defendant board of trustees in this case since the statute which governs the operations of community colleges (Ill. Rev. Stat. 1977, ch. 122, par. 101—1 *et seq.*) did not expressly adopt the Administrative Review Act.[1]

■■ It is a well established principle of Illinois law that the Administrative Review Act is applicable only where it is expressly adopted by the statute creating or conferring power on the agency involved. And where the Act is so adopted, review under its provisions is in fact the only method of review, to the exclusion of any other statutory, equitable or common law mode of review of decisions of administrative agencies available prior to the Act. *Smith v. Department of Public Aid* (1977), 67 Ill. 2d 529, 367 N.E.2d 1286.

■■■ The supreme court in the *Smith* case also considered common law *certiorari* as an available method for review of administrative decisions in those instances where the Administrative Review Act was not available. They held:

> "Review of agency action by prior available methods, then, is only prohibited if the Administrative Review Act is expressly adopted; 'if the statute creating or conferring power on an administrative agency does not contain an express reference to the Administrative Review Act, and provides for no other form of review, then common-law certiorari is a general method for reviewing the action of agencies and tribunals exercising administrative functions.' " (*Smith v. Department of Public Aid* (1977), 67 Ill. 2d 529, 541, 367 N.E.2d 1286, 1292-93.)

In view of this pronouncement common law *certiorari* is available to review the administrative decision of a board of trustees of a community college district. One further statement in the *Smith* case is of import here and should be noted:

> "This court has recently held that the substantial differences that at one time existed between common law and statutory [Administrative Review Act] *certiorari* have been all but obliterated." (*Smith*

---

[1] We find two instances where the legislature made the provisions of the Administrative Review Act applicable to proceedings held pursuant to some aspects of the Community College Act, neither of which are even arguably applicable to this case. One of those instances is upon a decision of the Illinois Community College Board (the State Board) granting or denying a petition to organize a district (Ill. Rev. Stat. 1977, ch. 122, par. 103—4), and the other instance is upon a decision of the State Board upon a petition to detach territory from one district and annex it to another (Ill. Rev. Stat. 1977, ch. 122, par. 106—5.9).

*v. Department of Public Aid* (1977), 67 Ill. 2d 529, 541, 367 N.E.2d 1286, 1293.)

Accordingly, we will conduct our review of the disposition made of count II of plaintiff's complaint by applying the standards applicable to review of cases conducted pursuant to the Administrative Review Act.

Plaintiff first contends that her suspension and termination by the board violated her constitutional rights to due process of law and were therefore illegal. As a consequence of such violation she asks that she be restored to her position and given back pay from the time of her discharge. Proper consideration of plaintiff's arguments requires a detailed factual setting leading to plaintiff's discharge.

Plaintiff was given notice of suspension by a letter from Chancellor Spencer dated October 21, 1975. This letter quoted a portion of his September 17, 1975, letter to plaintiff. In that earlier letter he had transmitted her new contract which set forth the terms of her sabbatical leave, *i.e.*, that her sabbatical and professional leaves were granted for the purpose of pursuing her doctorate on a full-time basis at either Eastern Illinois University or the University of Illinois, in lieu of her plans to attend Western Colorado University. In the letter of October 21, 1975, Spencer advised plaintiff that she was considered to be in violation of her contract, that the violation was not becoming of a faculty member of the college and constituted an unsatisfactory performance of contracted services. For those reasons plaintiff was suspended by Spencer without pay and advised that he would recommend to the board that she be dismissed from the faculty.

At its meeting held on the same day as the notice-of-suspension letter, October 21, 1975, the board of trustees adopted a resolution discharging plaintiff as of the prospective date of January 1, 1976, and sent a certified copy thereof to plaintiff. The resolution of discharge read:

"R E S O L U T I O N

WHEREAS, Christine Maas did orally request of Dr. James S. Spencer, Chancellor, in early September, 1975, a change of her proposed Sabbatical Leave for the 1975-76 academic year from study at Western Colorado University to either Eastern Illinois University or the University of Illinois, or both said universities in the State of Illinois; and

WHEREAS, pursuant to that request Dr. Spencer sent to her a proposed contract drawn in accordance with her said request, and transmitted same to her with letter dated September 17, 1975, in terms as follows:

'Enclosed herewith is a contract for the 1975-76 academic year approved yesterday by the Board of Trustees. It is identical to the contract extended to you on June 17, 1975

with the exception that the sabbatical and professional leaves are granted for the purpose of your pursuing either the doctorate or other advanced work on a full-time basis at Eastern Illinois University and/or the University of Illinois. This is in lieu of your plans to attend Western Colorado University which were your plans at the time you originally requested the sabbatical leave.'

and,

WHEREAS, Christine Maas did sign said contract so transmitted to her on or about September 26, 1975, and returned same to the administration of this College District; and

WHEREAS, the appropriate officials at both of said universities in the State of Illinois have, upon inquiry from the administration of this College District, advised in writing that Christine Maas is not registered at either Eastern Illinois University or the University of Illinois; and

WHEREAS, the failure to so register by Christine Maas is a violation of her contract executed under date of September 26, 1975, and also is an occurrence which in the opinion of the Chancellor is not becoming to a faculty member or employee of the College District as well as unsatisfactory performance of contracted services; and

WHEREAS, Dr. Spencer, Chancellor, has recommended to this Board that Christine Maas be discharged from service in this Community College District and all contractual connection of this College District with Christine Maas be severed.

IT IS, THEREFORE, resolved that all connection of Christine Maas contractual, and otherwise, with this Community College District No. 529 be, and the same is hereby declared, terminated, and she is dismissed from the faculty of Olney Central College, effective the 1st day of January, 1976 and that notice of same shall be given to Christine Maas by sending a certified copy of this resolution to her through first class U.S. mail posted at Olney, Illinois, postage fully prepaid, and if said notice is not served upon her at least 60 calendar days before that effective date of termination, then 60 calendar days after such notice is served upon her.

IT IS FURTHER RESOLVED, that all payment of salary of Christine Maas be suspended until said date of termination, because of her failure to comply with her said contract."

The college policy manual sets forth "Procedure For Termination of Tenured Appointments Other than Retrenchment." Plaintiff testified that she had a copy of this manual and was aware that she had a right to a

hearing. The policy manual authorizes the chancellor to suspend temporarily any member of the teaching staff for several stated causes, including those set forth in the suspension letter to plaintiff of October 21, 1975. The manual further provides that termination does not become effective until approved by a majority vote of all members of the board upon specific charges made. The terminated teacher is to be served with written notice at least 60 calendar days before the effective day of termination, and the notice must contain a statement of reasons which led to the recommendation for termination. The procedure states that the faculty member shall be entitled to a hearing before the board upon written request. The hearing before the board is to be held within 10 days after service of the request. The faculty member may attend the hearing, be represented by counsel, present evidence, offer defenses, and subpoena, present and cross-examine witnesses. Testimony at the hearing shall be under oath, and a record of the hearing shall be made. Finally, it is provided that the board may suspend the faculty member pending the hearing, but if acquitted the faculty member shall not suffer the loss of any salary by reason of the suspension.

On November 14, 1975, counsel for plaintiff requested a bill of particulars and a hearing. The bill of particulars was furnished December 11, 1975, and reads as follows:

### "BILL OF PARTICULARS

Pursuant to demand of Attorney Stephen M. O'Byrne, on behalf of Mrs. Christine Maas, in his letter of November 14, 1975, addressed to the Board of Trustees, Illinois Eastern Community Colleges, the Administration of Community College District No. 529 furnishes herewith its Bill of Particulars as to charge brought against Christine Maas:

That Christine Maas did agree in September, 1975, to take sabbatical leave for the Fall Quarter of the 1975-76 academic year for the purpose of pursuing either the doctorate or other advanced work on a full-time basis at Eastern Illinois University and/or the University of Illinois, in lieu of her prior plans to attend Western Colorado University (which she planned to attend at the time she originally requested the sabbatical leave).

That Christine Maas did not pursue and is not pursuing either the doctorate or any advanced work on a full-time basis at Eastern Illinois University or the University of Illinois, or at both, as she had agreed."

The hearing was set for December 19, 1975, but by agreement was continued to and held upon January 29, 1976. Following the hearing the board dismissed plaintiff effective January 29, 1976.

██ Plaintiff's initial due process argument addresses her premise that as a tenured teacher of defendant college she had a legitimate claim of entitlement to continued employment and that this claim constituted a right of "property" protected by due process as delineated in *Board of Regents v. Roth* (1972), 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701. With this statement defendant agrees and we agree.

Plaintiff strenuously argues that she was deprived of her rights to due process when she was suspended without pay and terminated on the same day. The post-termination hearing, she contends, is not sufficient since interpretative case law establishes her rights to notice and hearing at the first stage of deprivation. Plaintiff cites *Bell v. Burson* (1971), 402 U.S. 535, 29 L. Ed. 2d 90, 91 S. Ct. 1586; *Sniadach v. Family Finance Corp.* (1969), 395 U.S. 337, 23 L. Ed. 2d 349, 89 S. Ct. 1820; and *Goldberg v. Kelly* (1970), 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011, which we have examined.

Defendant counters with the contention that the dismissal procedure followed gave full recognition to plaintiff's due process rights, complied with its own termination procedures and was well within the requirements of the interpretative cases. Defendant cites *Arnett v. Kennedy* (1974), 416 U.S. 134, 40 L. Ed. 2d 15, 94 S. Ct. 1633; *Mathews v. Eldridge* (1976), 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893; and *Memphis Light, Gas & Water Division v. Craft* (1978), 436 U.S. 1, 56 L. Ed. 2d 30, 98 S. Ct. 1554, which we have also examined.

Plaintiff seems to concede, as we think she must, that the courts have resolved issues relating to the particular form and timing of the hearings required by due process in particular cases by examining and balancing the respective interests of the State and the property holder.

The defendant cogently argues that resort to the balancing-of-interests process need not be made in this case since the plaintiff was not subjected to a prehearing termination. It points to the fact that the termination date of plaintiff's services was projected to a date more than 60 days distant from the date of adoption of the resolution of discharge and that plaintiff was offered a full hearing within that time frame. The full hearing would have been so held but for the agreement of plaintiff and defendant to schedule it a few days beyond the 60-day period.

We cannot help but notice that in her brief plaintiff has completely ignored the 60-day prospective operative effect of her discharge. Her entire argument is premised upon the assumption that she was discharged upon the same day she received the notice of the resolution of discharge and that no hearing was held prior to that event. We cannot ignore the obvious fact that the resolution of discharge of plaintiff was prospective in its operation, that plaintiff was afforded an opportunity for a hearing which was fully compliant with due process requirements prior to the

effective date of final termination, and that in the event the plaintiff prevailed she would recoup all salary lost pending the determination.

However, we deem it unnecessary to decide that the procedure adopted and followed by the defendant, which called for prospective discharge with an interim hearing, was, without more, sufficient to afford the plaintiff due process. For when the balancing-of-interests test is coupled with the adopted procedure we think it must go unquestioned that plaintiff did in fact receive due process.

In *Powell v. Jones* (1973), 56 Ill. 2d 70, 78, 305 N.E.2d 166, 170, our supreme court gave recognition to the balancing test in the following language:

> "That fact [of due process protection of certified employment status], however, is not in our judgment dispositive of the case, for the requirements of due process are necessarily proportional to the weight of that interest in balancing it against the countervailing interests of society in effective and efficient governmental operation."

And in *Rios v. Jones* (1976), 63 Ill. 2d 488, 497, 348 N.E.2d 825, 829, it was stated:

> "The demands of due process are proportional to the weight of the interest being protected in balancing that interest against the countervailing interests of society. (*Powell v. Jones*, 56 Ill. 2d 70, 78.) If, after balancing these interests, the State's exercise of its police power is deemed to be reasonable, the legislation in question must be upheld."

The foregoing is patterned after the rule fashioned by the United States Supreme Court, which may be exemplified by *Dixon v. Love* (1977), 431 U.S. 105, 52 L. Ed. 2d 172, 97 S. Ct. 1723, where the court discussed the due process implications of an Illinois statute which authorized the suspension or revocation of the license of a driver who repeatedly had been convicted of traffic offenses. The relevant statute and administrative regulations provided for an initial summary decision with a full administrative hearing available only after the suspension or revocation had taken effect. The court stated:

> "It is equally clear that a licensee in Illinois eventually can obtain all the safeguards procedural due process could be thought to require before a discretionary suspension or revocation becomes final. Appellee does not challenge the adequacy of the administrative hearing, noted above, available under §2—118. The only question is one of timing. This case thus presents an issue similar to that considered only last Term in *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976), namely, 'the extent to which due process requires an evidentiary hearing prior

to the deprivation of some type of property interest even if such a hearing is provided thereafter.' We may analyze the present case, too, in terms of the factors considered in *Eldridge*:

> '[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " (*Dixon v. Love* (1977), 431 U.S. 105, 112-13, 52 L. Ed. 2d 172, 180, 97 S. Ct. 1723, 1727.)

In concluding in *Dixon v. Love* the court found that the public interests present were sufficiently visible and weighty for the State to make its summary initial decision effective without a predecision administrative hearing.

After balancing the interests of the defendant in this case with the countervailing interests of the plaintiff we must conclude that the interests of defendant in maintaining the integrity of its operation and control of the college far outweigh the interests of the plaintiff in having a full due process hearing prior to the onset of the 60-day prospective discharge date. Appropriate to our decision is the following language from the concurring opinion of Mr. Justice Powell in *Arnett v. Kennedy*:

> "In the present case, the Government's interest, and hence the public's interest, is the maintenance of employee efficiency and discipline. Such factors are essential if the Government is to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency. Moreover, a requirement of a prior evidentiary hearing would impose additional administrative costs, create delay, and deter warranted discharges. Thus, the Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial.
>
> Appellee's countervailing interest is the continuation of his public employment pending an evidentiary hearing. Since ap-

pellee would be reinstated and awarded backpay if he prevails on the merits of his claim, appellee's actual injury would consist of a temporary interruption of his income during the interim. To be sure, even a temporary interruption of income could constitute a serious loss in many instances. But the possible deprivation is considerably less severe than that involved in *Goldberg* [*Goldberg v. Kelly* (1970), 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011], for example, where termination of welfare benefits to the recipient would have occurred in the face of 'brutal need.' * * *
* * *

On balance, I would conclude that a prior evidentiary hearing is not required and that the present statute and regulations comport with due process by providing a reasonable accommodation of the competing interests." *Arnett v. Kennedy* (1974), 416 U.S. 134, 168-71, 40 L. Ed. 2d 15, 41-43, 94 S. Ct. 1633, 1651-52.

■■ We think the foregoing authorities amply demonstrate that the termination procedure followed by defendant did not violate plaintiff's rights to due process, and we so hold.

Plaintiff next argues that the trial court committed error of both fact and law in denying her motion for summary judgment. The argument that an error of law was committed is founded upon the proposition that the second contract extended to her, that authorized at the September 16, 1975, meeting of the board, was the entirety of the agreement between plaintiff and the board, and that the terms of such contract could not be varied or enlarged by the September 17, 1975, letter of transmittal of the contract from Chancellor Spencer or by the resolution adopted by the board. The September 16, 1975, contract made no mention of any requirement that plaintiff attend the University of Illinois or Eastern Illinois University as a condition of her sabbatical leave. Plaintiff asserts this left her free to pursue her sabbatical studies in accordance with the original authorization by the sabbatical committee the previous May and that by pursuing her studies under the auspices of Western Colorado University she was fulfilling both letter and spirit of her contract.

Plaintiff discounts as not contractually binding the resolution of the board, adopted on September 16, 1975, and the cover letter from Chancellor Spencer, dated September 17, 1975. The resolution reads:

"Christine Maas be extended a contract identical to the one extended in June, 1975, by the Board of Trustees and that it be broadened to include her pursuit of the doctorate at Eastern Illinois University and the University of Illinois, under terms of the previous contract. Said contract must be accepted, if at all, within fifteen (15) days."

The cover letter, among other matters, advised plaintiff that she was to

pursue either her doctorate or other advanced work "on a full-time basis at Eastern Illinois University or the University of Illinois. This is in lieu of your plans to attend Western Colorado University * * *."

Succinctly stated, plaintiff contends that the contract of September 16, 1975, is a complete integration of the agreement of the parties, *i.e.*, the defendant board and herself. That there was an agreement is not disputed by either party. The dispute relates to the terms of the agreement and what may be considered in deriving those terms.

We cannot agree with plaintiff's position. If the September 16, 1975, contract was a complete integration of the agreement it necessarily would have to have been executed as a singular isolated act of the parties. The record soundly refutes any such notion. The contract was but the final, brief culmination of a long series of conversations, meetings, letters, board resolutions and antecedent contracts. Patently, then, the September 16, 1975, contract did not embody either the agreement or the understanding of either of the parties. Reference to the antecedent and contemporary proceedings discloses a surfeit of evidence that the September 16, 1975, contract was not an integration. And it certainly cannot be said that these matters constitute a variation of the terms of the agreement; rather, they served but to exemplify the terms of the agreement.

Plaintiff is to be commended for avoiding any reference to the "parol evidence rule" in arguing the point in her brief. However, the law touching upon the issue presented is discussed under the nomenclature of "the parol evidence rule," and we must therefore discuss it in those terms. Our references may be brief for we have found that plaintiff's position is untenable for the reason that the September 16, 1975, contract was not expressive of the complete agreement and understanding of the parties.

In 3 Corbin on Contracts §573 (1966), the author cites the "parol evidence rule" and a critique of terminology, saying, in part:

> "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing. This is in substance what is called the 'parol evidence rule,' a rule that scarcely deserves to be called a rule of evidence of any kind, and a rule that is as truly applicable to written evidence as to parol evidence."

In section 588, volume 3, of his treatise Professor Corbin states: "The American Law Institute makes use of the term 'integration' and follows Wigmore in constructing the following definition:

> 'An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the

agreement. An integration is the writing or writings so adopted.' "
(See Restatement of Contracts §228 (1932).)

Corbin continues in section 588: "In every case it is a question of fact, and in some cases a very difficult one, whether the parties did in fact 'adopt' a particular writing or writings as the 'final' and 'complete' expression of the terms of their bargain—the performances and the promises, conditional or absolute, that they mutually consent to exchange."

In Restatement of Contracts §228, comment *a*. (1932), it is stated:

> "*a*. Integrated contracts must be distinguished from written memoranda by which contracts may be proved, and from contracts formed by letters or other informal writings the words of which have not been assented to by both parties as a definite and complete expression of their agreement. It is an essential of an integration that the parties shall have manifested assent not merely to the provisions of their agreement, but to the writing or writings in question as a final statement of their intentions as to the matters contained therein. If such assent is manifested the writing may be a letter, telegram or other informal document. That a document was or was not adopted as an integration may be proved by any relevant evidence."

Specific in its application to the facts of this case is the comment of Professor Corbin in volume 3, section 577, of his treatise where he states: "One signing a formal agreement and sending it along with a modifying letter to the other party does not so far integrate the contract as to prevent proof of the modifying letter." He cites *Duplex Envelope Co. v. Baltimore Post Co.* (1933), 163 Md. 596, 163 A. 688, and *V-I Oil Co. v. Anchor Petroleum Co.* (1959), 8 Utah 349, 334 P.2d 760.

The authorities seem to be in accord in holding that all relevant evidence may be considered in order to determine whether a particular writing is in fact the complete agreement of the parties. *After* it has been determined that a particular writing is in fact the complete agreement, *then* under the "parol evidence rule" it cannot be altered.

Tested by the foregoing precepts, the contract of September 16, 1975, plainly did not contain the complete agreement of the parties. Accordingly, the board, sitting as the hearing agency, and the circuit court properly could have, and should have, considered all the evidence touching upon the grant of sabbatical leave to the plaintiff, including the letter of transmittal from Chancellor Spencer of September 17, 1975, and the resolution of the board adopted September 16, 1975, together with all the other evidence, both oral and written, in determining the complete agreement. When the relevant evidence is so considered it is evident that the final agreement regarding plaintiff's sabbatical leave was that she would have one quarter of sabbatical leave at full pay and two quarters of

professional leave and that she was to pursue her studies by enrolling at either the University of Illinois or Eastern Illinois University. The record leaves no room for a denial that these terms and conditions attend the contract made or for the conclusion that in not fulfilling them the plaintiff was in breach of contract.

We find plaintiff's position to be equivocal on the point. She asks the court to enlarge the September 16, 1975, contract by referring to the original grant of leave by the sabbatical leave committee to establish terms and conditions but yet contends that reference may not be made to other subsequent transactions. Such reference as plaintiff requests can be made, but it must be considered along with all other evidence that bears upon the agreement made.

Plaintiff addresses an argument to the lack of evidence to support the finding of the board and the trial court and to the alleged legal insufficiency of the grounds for her discharge. What we have said respecting the process for determining the true agreement of the parties furnishes more than sufficient factual basis to support the findings made and the legal sufficiency thereof. The dealings between the plaintiff and the defendant and its agents is set forth in detail above and need not be summarized again. When it was discovered by defendant that plaintiff had not enrolled at either the University of Illinois or Eastern Illinois University, it was the final stroke. Plaintiff's actions exasperated and frustrated the board and the officials of the college. Plaintiff finally showed herself to be intractable, unamenable and completely adamant in her refusal to comply. The board's action in discharging her was justified.

■■ Plaintiff's final argument is that the court erred in not granting her motion for summary judgment as to count III of the complaint which sought a writ of *mandamus*. Our disposition of the issues raised in count II of the complaint disposes of the issues of count III as well. *Mandamus* is an extraordinary remedy which requires a showing of a right to the relief requested, and no such showing has been made. *Ganley v. City of Chicago* (1974), 18 Ill. App. 3d 248, 309 N.E.2d 653.

Affirmed.

KARNS, J., concurs.

Mr. JUSTICE HARRISON, dissenting in part[1]:
I dissent in part.

I concur in the majority's determination that the writ of *certiorari* was a properly available form of procedural relief under the circumstances

---

[1] Justice Moses W. Harrison replaced Justice George J. Moran, who retired after oral argument.

which confronted this plaintiff. The writ may be granted where a petitioner shows that an inferior tribunal has exceeded its jurisdiction or has failed to proceed according to law and no other mode of direct review is obtainable. (*Loomis v. Wilkinson* (1852), 13 Ill. 660, 663; *Goodfriend v. Board of Appeals* (1973), 18 Ill. App. 3d 412, 418, 305 N.E.2d 404.) *Barden v. Junior College District No. 520* (1971), 132 Ill. App. 2d 1038, 271 N.E.2d 680, *cert. denied* (1972), 406 U.S. 920, 32 L. Ed. 2d 120, 92 S. Ct. 1777, cited as a ground for denying *certiorari*, although a sound decision, is distinguishable for two simple reasons; first, Maas alleges the violation of constitutional rights which are not properly reviewable in a contract action; second, and intertwined with the former, in a common law action in contract, reinstatement is not an available remedy because of the general rule that an employment contract will not be specifically enforced; thus, one of Maas' chief interests in instituting the present litigation would not be served.

However, upon reaching the merits of this cause, I would decline to resolve the constitutional issues of substantive and procedural due process raised by the appellant because of the opposing position I set out hereafter regarding the contractual agreement which existed between these parties. Since a decision according to this position would dictate reversal of the circuit court's decision, there would be no necessity to add our voice to the already multitudinous opinions which have sifted the constitutional ramifications engaged by the discharge of public employees. *Haughton v. Haughton* (1979), 76 Ill. 2d 439, 448, 394 N.E.2d 385; *Lulay v. Peoria Journal-Star, Inc.* (1966), 34 Ill. 2d 112, 116, 214 N.E.2d 746; *In re Estate of Ersch* (1963), 29 Ill. 2d 572, 577, 195 N.E.2d 149; see generally *Ashwander v. Tennessee Valley Authority* (1936), 297 U.S. 288, 347, 80 L. Ed. 688, 56 S. Ct. 466 (Brandeis, J., concurring); accord, *Youngstown Sheet & Tube Co. v. Sawyer* (1952), 343 U.S. 579, 595, 96 L. Ed. 1153, 72 S. Ct. 863 (Frankfurter, J., concurring).

In resolving this extraordinarily contentious dispute the standard and scope of review which we are bound by has been clearly stated. The only province of the reviewing court is to consider the entire record, ascertain the presence or absence of jurisdiction in the tribunal below, and find whether it has proceeded according to law and acted upon evidence. *Quinlan & Tyson, Inc. v. City of Evanston* (1975), 25 Ill. App. 3d 879, 884, 324 N.E.2d 65.

In the case at bar it is necessary to decide whether evidence in the record fairly tends to support the conclusion of the board that Maas as a matter of law acted in breach of the terms of her sabbatical leave contract, thus constituting sufficient cause for her suspension and dismissal. If the findings of an administrative agency are erroneous as a matter of law, the appellate court need not defer to legal conclusions arrived at by the

agency in making its decision; if not, and the evidence is properly supportive, the court is bound to uphold it. See *Danison v. Paley* (1976), 41 Ill. App. 3d 1033, 1036, 355 N.E.2d 230.

The majority correctly emphasizes the importance of parol evidence in this case. But additional rules of construction need to be applied as well. In order to decide whether Maas acted in breach of contract, the terms of the agreement must be fully understood. If conditions to performance exist, they must be made free of ambiguity. In aid of this process there is the rule that where a contractual document is ambiguous its contents will be construed most strongly against the party responsible for its preparation; because that party chose the words used he is responsible for the ambiguity. The ultimate concern is to discern the substantial intent of the parties. To do that the agreement as a whole must be examined; its nature, purpose, subject matter and, if ambiguous, the circumstances under which it was made must all be taken into account to arrive at a proper construction. *Marshall Field & Co. v. J. B. Noelle Co.* (1967), 81 Ill. App. 2d 409, 414, 226 N.E.2d 454.

Appellees place great weight on the content of a covering letter by Chancellor Spencer dated September 17 (reproduced by the majority at page 12), arguing that it must be read as a part of the agreement which Maas signed. Appellant, on the other hand, seeks to exclude this letter from consideration asserting that the notice of intent dated September 16 (reproduced below) must be interpreted as the operative document, complete on its face, executed by both parties, and making no reference whatsoever to the covering letter. The focus of either position is overly constricted where ambiguities exist and the parties' understanding of the agreement has been called into question. In urging that the covering letter be read as part of the agreement appellees cite *Rudolph v. O. D. Jennings & Co.* (1962), 38 Ill. App. 2d 92, 97, 186 N.E.2d 80. There the fundamental principle is stated that the introduction of other memoranda is prohibited by the parol evidence rule only when it is determined that a document is the complete and exclusive statement of the agreement of the parties, as the majority insists. Appellees would have us open the door but a notch; I believe we are obliged to open it further and examine what the light will reveal. To begin with, the September 16 and September 17 writings are in no way complete and exclusive. The long process of negotiation that preceded the signing of a contract for the 1975-1976 academic year began in November of 1974.

The intermittent communications between the parties were plagued by confusion, inattention, misunderstanding, and what may charitably be called plain and wilful hard bargaining. It appears that Maas felt throughout entitled to a sabbatical on terms which the administration could not, for reasons beyond its control, accede to during the 1975-1976

academic year. Recognizing this, appellant reduced her demands on several occasions only to raise them again in frustration during later discussions. The appellees' position remained consistent, being prepared to offer a leave for the fall quarter at full salary and a professional leave of absence without salary for the remaining winter and spring quarters. In all, four separate contractual memoranda were submitted to the appellant. Only the final operative instrument dated September 16, 1975, is material and it is set out below:

"ANNUAL STATEMENT TO INSTRUCTORS ON TENURE
ILLINOIS EASTERN COMMUNITY COLLEGES
DISTRICT NO. 529
OLNEY, ILLINOIS
DATE    September 16, 1975

TO Christine Maas

The Board of Trustees, Illinois Eastern Community Colleges, District No. 529, Olney, Illinois wishes to state:

1. That you are recorded as an instructor under continued contractual service as provided by the Board Rules and Regulations.

2. That your base salary for the 1975-76 academic year as established by the official College Calendar (term of nine months) will be $5,483.33 (1/3 of salary for Sabbatical Leave) (Sabbatical Leave for Fall Quarter and Professional Leave for Winter and Spring Quarter)

INFORMATION

Year of Teaching 20 Degree Classification M + 60 College Olney Central.

Will you kindly return within fifteen days one of the enclosed forms.

By Order of Board of Trustees
Date September 16, 1975

/s/ James Spencer
Chancellor

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

NOTICE OF INTENT

I, Christine Maas, instructor in the Illinois Eastern Community Colleges, District No. 529, Olney, Illinois, hereby state that I do intend a Sabbatical Leave in the said College District for the Academic year of 1975-76.

(Signed)    Christine Maas
Instructor

(Date)      Sept. 26, 1975."

Along with this simple memorial, Chancellor Spencer's covering letter dated September 17 (reproduced by the majority at page 12) was sent. It is the contention of the appellees that this letter must be read as part of the contract which Maas signed and agreed to perform. The majority in essence adopts this point of view. But this is to ignore other facts which I believe necessitate a differing outcome.

Previous to signing the contract set forth above, the responsible administrative committee approved Maas' sabbatical study proposal (submitted on March 20, 1975) as required in regulations promulgated by the District. Language within the proposal clearly put the committee and the board on notice of the planned course of study which Maas intended to pursue. Its approval can leave no doubt that such a regime of study was academically and administratively acceptable to the defendants. In significant part it specified that:

"The degree programs at Western Colorado University center around the concepts of the 'Topic of Study' and the 'Graduation Contract' as opposed to traditionally numbered courses and sequences.

\* \* \*

I selected Western Colorado University because of its special programs and innovative strategies. In keeping with the University's individualized, personalized philosophy of education, a flexible registration schedule has been implemented.

\* \* \*

Students are classified under one of two headings: Internal or External.

\* \* \*

Internal [sic] students are those individuals who are registered in a degree program at the University, but who are pursuing their studies at a location other than on the University campus. Such off-campus studies are normally supervised by external advisors, and may consist of independent study and research in a nearby library, formal courses taken at another approved college or university, or a combination of these and other learning approaches. It is also possible to carry on studies through taped instructions, written communication, telephone advisement, and programmed instructional material."

The administration argues that the parties agreed and Maas verbally acceded to a course of instruction which involved full-time enrollment at either E.I.U. or the University of Illinois. Both schools were already in session at the time of the September 6 meeting, a fact it is difficult to believe those involved did not know. Maas contends that she did not agree to alter her sabbatical arrangements, that she was to continue as an

external student enrolled at W.C.U., and that she followed the course of study indicated to the committee by working independently on papers and sitting in on courses at E.I.U.

There was no meeting of the minds regarding a change in the substantive content of Maas' sabbatical plans as is proposed by the appellee and adopted by the majority as a result of the meeting of September 6, nor was there later on the 26th when Maas signed the notice of intent. The appellant always planned to use the facilities of E.I.U., and never intended to "attend" W.C.U. during the time in question. While there appears to have been a unilateral misunderstanding, the parties, at a minimum, agreed to the proposition which the administration, through its sabbatical leave committee, had put forward from the beginning and which Maas reluctantly accepted. This proposition had been voted by the board and incorporated the original sabbatical proposal adopted by the leave committee and recommended for board approval by the chancellor. The minutes concerning the board's final resolution on the contract read as follows:

"B. *Contract Extended*—Trustee William E. Hoffee made a motion that Christine Maas be extended a contract identical to the one extended in June, 1975 by the Board of Trustees and that it be broadened to include her pursuit of the Doctorate at Eastern Illinois University and the University of Illinois, *under terms of the previous contract*. Said contract must be accepted, if at all, within 15 days." (Emphasis added.)

It is undisputed that Maas continued to work on her doctoral studies as a W.C.U. graduate student throughout the fall term and into 1976, the purpose for which professional leave was given to her. The record also shows that Maas had completed 60 post-graduate credit hours at E.I.U. prior to the proposed fall sabbatical. It does not appear from the record that "enrollment" at either of the Illinois universities, full-time or otherwise, was a prerequisite to the completion of her Ph.D. requirements as approved through proper channels of authority at Olney Central. Resolution of any dispute as to curriculum is certainly not within our authority.

Even when the covering letter is read as part of the contract, it is not evident that it requires enrollment per se at these universities. For instance, the words "on a full-time basis" in that letter referred to pursuit of post-graduate study. There is nothing in the record to dissuade me from the belief that Maas performed according to her sabbatical proposal when it is considered in conjunction with these documents. The letter and the attached notice of intent are devoid of any more specific statement regarding the nature of the performance required. The only written source of greater detail is the approved and adopted sabbatical proposal of March 20, 1975.

Hence, I can arrive at no construction of the agreement which would lead me to believe that the board has been deprived of the benefit of its bargain. Maas' dismissal, as the result of such a construction, would work a complete forfeiture of her contractual right to a tenured position.

It follows from the above discussion that under these facts Maas did not breach the agreement which resulted, as a matter of law, between the parties. Thus, she was not guilty of any conduct which could be said to have been unbecoming of a faculty member or which could constitute unsatisfactory performance of contracted services. I find that the record fails to contain any evidence fairly tending to support the conclusion of the board of trustees and the decision of the circuit court upholding it.

Therefore, I would reverse the judgment of the trial court.

